IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| BILL J. JACKSON, | ) | Civil No. 08-6177-JE |
| | ) | |
| Plaintiff, | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Kathryn Tassinari
Brent Wells
Harder, Wells, Baron & Manning, P.C.
474 Willamette, Suite 200
Eugene, OR 97401

Attorneys for Plaintiff

Kent Robinson
Acting U.S. Attorney
Adrian L. Brown
Asst. U.S. Attorney
1000 SW 3rd Avenue, Suite 600
Portland, OR 97204-2902

FINDINGS AND RECOMMENDATION - 1

Thomas M. Elsberry
Special Asst. U.S. Attorney
Social Security Administration
701 5th Avenue, Suite 2900 M/S 901
Seattle, WA 98104-7075

      Attorneys for Defendant

JELDERKS, Magistrate Judge:

Plaintiff Bill Jackson brings this action pursuant to 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security (the Commissioner) denying his application for Disability Insurance Benefits (DIB). Plaintiff seeks an order reversing the Commissioner's decision and remanding the action to the Social Security Administration (the agency) for an award of benefits. The Commissioner concedes that the decision should be reversed, but contends that it should be remanded for further proceedings rather than for an award of benefits.

For the reasons set out below, I recommend denying the Commissioner's motion to remand, reversing the Commissioner's decision, and remanding the action for an award of benefits.

Procedural Background

Plaintiff filed an application for DIB on February 9, 2005, alleging that he had been disabled since November 10, 2003. He later amended the alleged date of his onset of disability to July 28, 2004.

After plaintiff's application for benefits was denied initially and upon reconsideration, plaintiff timely requested a hearing before an ALJ.

FINDINGS AND RECOMMENDATION - 2

A hearing was held before ALJ Jean Kingrey on February 13, 2007.  That hearing was continued to allow for further development of the record, and a second hearing was conducted on December 4, 2007.

On January 25, 2008, the ALJ issued an opinion finding that plaintiff was not disabled within the meaning of the Social Security Act (the Act).  That decision became the final decision of the Commissioner on April 21, 2008, when the Appeals Council denied plaintiff's request for reconsideration.  Plaintiff brings the present action to challenge that decision.

<u>Factual Background</u>

Plaintiff was born on February 28, 1953, and was 54 years old at the time of the most recent hearing before the ALJ.  He graduated from high school, and has past relevant work experience as a heavy equipment operator.

<u>Disability Analysis</u>

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 C.F.R. §§ 404.1520, 416.920.  Below is a summary of the five steps, which also are described in <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

<u>Step One</u>.  The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA).  A claimant engaged in such activity is not disabled.  If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two.  20 C.F.R. § 404.1520(b).

Step Two.  The Commissioner determines whether the claimant has one or more severe impairments.  A claimant who does not have such an impairment is not disabled.  If the claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under Step Three.  20 C.F.R. § 404.1520(c).

Step Three.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1.  A claimant who has such an impairment is disabled.  If the claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four.  20 C.F.R. § 404.1520(d).

Step Four.  The Commissioner determines whether the  claimant is able to perform work he or she has done in the past.  A claimant who can perform past relevant work is not disabled.  If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R. § 404.1520(e).

Step Five.  The Commissioner determines whether the claimant is able to do any other work.  A claimant who cannot perform other work is disabled.  If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates that a significant number of jobs exist in the

national economy that the claimant can do, the claimant is not disabled.  If the Commissioner

does not meet this burden, the claimant is disabled.  20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant.  <u>Tackett</u>, 180 F.3d

at 1098.  At Step Five, the burden shifts to the Commissioner to show that the claimant can

perform jobs that exist in significant numbers in the national economy.  <u>Id.</u>

Medical Evidence

On September 23, 2003, plaintiff injured his left knee when he slipped and fell on a

slope at a construction site where he was working.  He was then off work until November 8,

2003.  On November 18, 2003, Dr. Steven Barad, an orthopedic surgeon, performed

arthroscopic surgery to repair a tear of the medial meniscus in the injured knee.

On January 19, 2004, plaintiff was involved in a motor vehicle accident while on his

way to an appointment with Dr. Barad.  Plaintiff's vehicle was struck in the driver's side by

another vehicle.  Plaintiff did not seek medical treatment at the time, but soon noted pain in

his neck, upper and lower back, and both shoulders, for which he was seen by his primary

care physician the following day.

In his examination of plaintiff's knee on January 19, 2004, Dr. Barad noted moderate

swelling, and concluded that plaintiff was "temporarily totally disabled" unless a job were

available that would allow plaintiff to sit.  In an examination conducted on April 5, 2004,

Dr. Barad noted that plaintiff's repaired knee had full range of motion without atrophy, slight

effusion, and slight tenderness to palpation along the medial femoral condyle.  He released

plaintiff to work with limited climbing, lifting, and squatting.

On April 21, 2004, plaintiff was referred to Dr. Imad Rashid, a physical medicine and rehabilitation specialist, based upon complaints of bilateral hand numbness and tingling. X-rays of the cervical and thoracic spine showed mild degenerative changes in the cervical spine and normal thoracic spine. Electrodiagnostic study showed bilateral carpal tunnel syndrome with moderate demyelination bilaterally and early axonal loss on the right medial nerve. Dr. Rashid noted that plaintiff reported experiencing neck pain and headache since the January, 2004 automobile accident.

During an office visit on May 3, 2004, plaintiff told Dr. Rashid that his main issue was the neck pain that he had started to experience following the automobile accident. Plaintiff reported that the pain increased if he sat for more than 30 minutes. In a visit with Dr. Barad the same day, plaintiff reported that he experienced occasional intermittent knee pain when climbing or walking more than 30 minutes, and occasional weakness in his left knee "with giving way." Though Dr. Barad noted mild swelling with effusion in plaintiff's left knee, he opined that plaintiff had "done very well in his overall recovery." Dr. Barad noted that plaintiff was undergoing treatment for injury to his neck, and had not been released to work from that injury. He indicated that plaintiff could return to work "based solely on his knee function at this point in time."

In a progress report dated May 6, 2004, Dr. Rashid reviewed the results of an MRI of plaintiff's cervical spine. He noted that the MRI showed multilevel degenerative disc disease at C3-4, mild degenerative disc changes at C4-5, degenerative disc disease with mild disc bulge with mild neural foraminal and central stenosis at C4-5, and degenerative disc disease with central disc protrusion and osteophyte complex with moderate central and mild neural foraminal stenosis at C6-7. Dr. Rashid also noted circumferential disc osteophye complex

without central canal stenosis at C7-T1.  Dr. Rashid offered plaintiff the option of an epidural

steroid injection.  Plaintiff indicated that he would like to try therapy and a home exercise

program before considering surgical options.

In a progress report dated May 28, 2004, Dr. Rashid noted that plaintiff reported that

his neck discomfort had improved with use of a home traction unit, but that he continued to

have some tension headache, ringing in his ears, and intermittent numbness and tingling in

his hands.  Dr. Rashid indicated that plaintiff had not returned to work "due to a slow

schedule at work, not because of his restrictions, as he is released."

In a progress report dated June 23, 2004, Dr. Rashid noted that plaintiff was

complaining of increased neck pain.  He noted that plaintiff had been working on a scraper

during the previous month "which involves a tremendous amount of bouncing," and that this

had aggravated plaintiff's symptoms.  Plaintiff described the pain as "in the neck and between

his shoulder blades," and reported that his shoulders ached.  Plaintiff also stated that he was

having significant difficulty sleeping, and experienced fluctuating numbness and tingling in

his hands.  Dr. Rashid noted that the range of motion in plaintiff's cervical spine continued to

improve, but was "lacking a few degrees with some guarding and paravertebral muscle

rigidity."  Plaintiff had full range of motion in his lumbar spine, and his shoulder

impingement signs were "mildly positive."  X-rays of plaintiff's shoulders taken the next day

were normal.

In a progress report dated July 28, 2004, Dr. Rashid noted that plaintiff complained of

increased neck pain and headache, and that plaintiff reported increased pain with increased

work.  Upon physical examination, plaintiff showed more guarding.  Though the range of

FINDINGS AND RECOMMENDATION - 7

motion of his cervical spine continued to improve, plaintiff demonstrated increased paravertebral muscle rigidity.

Plaintiff saw Dr. Pasquale Montesano, a spinal surgeon, for a second opinion the same day.  Dr. Montesano diagnosed a two-level disc herniation, and recommended an anterior cervical discectomy, fusion, and plating.

In a progress report dated August 23, 2004, Dr. Rashid noted that plaintiff continued to complain of neck pain with headache, and continued to have guarding with cervical spine range of motion, which was limited to "about 20 degrees in all spheres."  Plaintiff's reflexes were diminished, and trace weakness was noted in plaintiff's hand grip.

Plaintiff was referred to Dr. Praveen Prasad, a neurosurgeon, for a second opinion. Upon examination on September 20, 2004, Dr. Prasad noted that plaintiff did not appear to exaggerate his symptoms, and was anxious to return to full time work as soon as possible. Plaintiff's range of motion was at least 2/3 normal, but he had "considerable paracervical tenderness."  Plaintiff reported that his pain continued to worsen since the time of his automobile accident, despite nonsurgical treatment.  Dr. Prasad concluded that plaintiff would be a good candidate for C5-6 and C6-7 discectomy with cadaver bone fusion and plate fixation.  He noted that plaintiff's back pain was less significant than his neck pain, and opined that it could "be addressed later if still necessary."

On October 7, 2004, Dr. Prasad performed discectomies with micro-surgical nerve root decompression/foraminotomies and plate fixation at C5-6 and C6-7.  On October 15, 2004, plaintiff told Dr. Prasad that he had sought emergency treatment a few days earlier for difficulty with breathing, and was found to be anxious.  He was given lorazepam for his

anxiety.  X-rays showed that his airway was clear, and there were no obstructive or alignment problems.  Plaintiff told Dr. Prasad that he was "getting better spontaneously."

In a visit to Dr. Prasad on November 8, 2004, plaintiff reported that his symptoms were "definitely better than before operation."  He was still having some difficulty swallowing, but that problem was improving.  Plaintiff was advised to wean himself from the cervical collar that he was using, and to begin physiotherapy for rehabilitation.

On November 9, 2004, plaintiff was examined by Dr. James Lilla, a "defense qualified medical examiner," for an evaluation of his upper extremities.  Dr. Lilla took plaintiff's medical history, performed a physical examination, and reviewed plaintiff's medical records.  Plaintiff told Dr. Lilla that his hands caused him more problems after the automobile accident, but that he had focused primarily on his neck problems.  Plaintiff reported that his neck felt a little better post operation, but that it was "too early to tell," and that there had been no change in the symptoms in his hands, which were often numb and painful, and disturbed his sleep.

Dr. Lilla concluded that plaintiff's symptoms might be consistent with carpal tunnel syndrome, but that diagnosis did not explain all of plaintiff's symptoms.  He opined that plaintiff's hand symptoms did not directly result from his knee injury or automobile accident, but were likely caused at least in part by his extensive work as a heavy equipment operator. Plaintiff told Dr. Lilla that, if it were not for his neck problems, despite his hand problems, he would probably be working.  Plaintiff also stated that he was not ready to commit to surgery on his hands, if that were offered.

In a visit to Dr. Prasad on December 13, 2004, plaintiff complained of pain in his left shoulder and difficulty using his left arm.  On examination, Dr. Prasad found that plaintiff

had considerable tenderness around his left shoulder, and was unable to abduct his left shoulder beyond about 90 degrees. Dr. Prasad opined that the shoulder pain appeared to be more related to the shoulder capsule "than referable to the cervical spine." He concluded that plaintiff remained temporarily totally disabled, and referred him to an orthopedic surgeon for evaluation.

Dr. Trek Lyons, an orthopedic surgeon, examined plaintiff on January 10, 2005. Plaintiff told Dr. Lyons that his shoulder had become painful after his cervical fusion, but Dr. Lyons thought it more likely that this problem started after his knee surgery in 2003. Dr. Lyons noted that plaintiff had significant tenderness to palpation over the left acromioclavicular (AC) joint, and range of motion became significantly painful at 90 degrees abduction and on forward flexion. An MRI obtained the same day revealed moderate degenerative changes in the AC joint, a small amount of fluid in the joint and edema of the distal clavicle, but no rotator cuff tears.

In a visit to Dr. Lyons on January 12, 2005, plaintiff complained of pain extending from his neck to the lateral aspect of his shoulder. He described a "band type feeling at the proximal humerus," and reported that he felt significant pain with any type of lifting motion. Dr. Lyons injected the shoulder with a solution of Lidocaine, Marcaine, and Celestone. The injection did not improve plaintiff's symptoms. Dr. Lyons opined that some of the pain was probably caused by the cervical spine "or some type of abnormality after the surgery."

On January 18, 2005, Dr. Thomas Pattison performed an electrodiagnostic evaluation of plaintiff's wrists. The test revealed bilateral median nerve dysfunction, which was moderate to moderately severe across the right wrist, and slight to moderate across the left wrist. No abnormalities consistent with cervical radiculopathy were found. Dr. Lilla also

reexamined plaintiff that day.  He opined that there was "quite probably a component of atypical carpal tunnel syndrome bilaterally."  In response to questioning by plaintiff, Dr. Lilla opined that multiple steroid injections might "get him through a work season."

In a visit to Dr. Prasad on January 19, 2005, plaintiff stated that his neck symptoms were "dramatically better" than they were before, but that he was not yet ready to try to return to work because of residual symptoms.  Dr. Prasad concluded that plaintiff remained temporarily totally disabled.  He noted that plaintiff continued to experience episodes of claustrophobia and anxiety, which plaintiff attributed to having gone through surgery and anesthesia.

On May 9, 2005, plaintiff told Dr. Prasad that the discectomy and plate fixation had improved his condition 20% to 25%, but that the significant paracervical pain and headaches he continued to experience limited his activity.  Plaintiff reported that he continued to experience some pain in his left shoulder and numbness in his hands.  Dr. Prasad noted that MRI scans had shown no evidence of residual or recurrent disc herniation, and had shown satisfactory alignment.  He added that the scans were "completely unremarkable except for evidence of the operation . . . with no residual foraminal stenosis or posterior disc protrusion."

Dr. Thomas Wuest, an associate of Dr. Lyons, evaluated plaintiff on May 12, 2005. Dr. Wuest noted that plaintiff had not returned to work since his cervical surgery, and reported that plaintiff said that his carpal tunnel had not bothered him much since he had been off work.  Plaintiff reported "a little bit of paresthesias and numbness when driving and writing," and no "nocturnal paresthesias."

FINDINGS AND RECOMMENDATION - 11

In a visit to Dr. Prasad on June 10, 2005, plaintiff reported that he continued to experience constant aching in his neck which radiated into his upper back and shoulder blades. Plaintiff reported that pain in his right shoulder, which was exacerbated by movement, made it difficult to raise his arm. Plaintiff stated that the combination of shoulder and neck pain was so severe that he could not contemplate returning to work. On examination, Dr. Prasad found that plaintiff's cervical range of motion was diminished in all directions. He found that plaintiff's neurological function remained normal, with no muscle wasting, numbness, or gait disturbance, and that pain made it difficult to test the strength in plaintiff's right shoulder. Dr. Prasad concluded that plaintiff should see a pain management specialist and a shoulder specialist.

Dr. Allan Kirkendall, a licensed psychologist, examined plaintiff on June 15, 2005. Plaintiff told Dr. Kirkendall that he had terrible neck pain, and weakness in his hands that made lifting impossible. He also said that he was putting off carpal tunnel surgery because his neck surgery had gone badly, and that he constantly worried about his future because he could not work and his financial situation was worsening. Dr. Kirkendall described plaintiff as a "very stoic individual" who had a strong need to be independent. He opined that plaintiff had a very strong work ethic, did not exaggerate his problems, and was "clearly not a malingerer." He reported that plaintiff appeared to be in severe pain during the interview and could not sit or stand in one position for any length of time. Dr. Kirkendall opined that plaintiff's judgment was "clearly impaired by his depression . . . ." As an example, he cited plaintiff's goal of being pain-free and working within a year–a goal that Dr. Kirkendall considered "clearly unrealistic and unobtainable."

Dr. Kirkendall diagnosed plaintiff with a mood disorder resulting from a motor vehicle accident which caused neck injury and chronic pain with major depressive disorder-like episodes.  He opined that, because of his depression, plaintiff would probably have problems understanding and remembering instructions "on a constant eight-hour day basis."  He also concluded that plaintiff was not capable of sustaining concentration and attention "over anything other than brief periods of time."  Though plaintiff appeared to a be "a persistent individual who wants to please others," Dr. Kirkendall concluded that, at that time, plaintiff's depression was so severe that he was incapable of engaging in appropriate social interactions."  He added that plaintiff was "overly irritable and very quick to react to anything he perceives as criticism," and lacked "general adaptive skills because of his level of depression."  Dr. Kirkendall rated plaintiff's Global Assessment of Functioning (GAF) during the previous year at 40, and opined that plaintiff was "unable to work at this point due to his current level of depression and the chronic pain he experiences."

Plaintiff began treating with Dr. Dara Parvin, an orthopedic spine surgeon, on July 19, 2005.  Plaintiff recounted the history of his increasing physical problems, and reported that he had increasing pain in his arms, shoulders, and upper extremities following his surgery.  Plaintiff reported that he had increasing problems with fine motor dexterity, numbness and weakness in his upper extremities, and problems dropping things.  Though his neck pain and headaches had initially subsided after surgery, they had subsequently gradually increased.  Plaintiff reported that he could not work because of his pain.

On examination, Dr. Parvin noted some pain behavior and significant limitation in the range of motion of plaintiff's neck.  Plaintiff had diffuse tenderness to palpation in both shoulders, positive provocative testing for impingement maneuvers, positive cross-test

FINDINGS AND RECOMMENDATION - 13

testing, and significant decreased range of shoulder motion. Dr. Parvin stated that the x-rays of plaintiff's cervical spine revealed mild radioluceny at the C5-6 level graft and C5 end plate junction, which "may represent a nonunion as a possible source of the patient's persistent neck pain and headaches." He noted that an MRI had shown persistent stenosis at the C3-4 level, and that plaintiff "actually has a diffuse disk bulge with anterior thecal encroachment L2-4, which likely contributes at least some degree to his headaches and neck pain, and possibly upper extremity radicular symptoms." Dr. Parvin opined that plaintiff was not "necessarily a surgical emergency," but thought that a course of steroids was "imperative." He added that surgery might be indicated if "all nonoperative measures" were unsuccessful.

In a visit to Dr. Lyons on July 20, 2005, plaintiff reported sharp pain and occasional swelling in his right knee. X-rays showed a mass in the proximal tibia, and an MRI showed a possible enchodroma and bone marrow edema, suggestive of possible early avascular necrosis or post-traumatic bone contusion. A bone scan showed abnormalities that were consistent with significant degenerative changes.

On May 5, 2005, Dr. Joel Renbaum performed an examination and review of plaintiff's medical records in order to evaluate plaintiff's neck, back, and left knee problems. Dr. Renbaum found that plaintiff had tenderness over the cervical musculature, decreased motion of the neck in flexion, extension, and rotation, and diffuse tenderness about the shoulder musculature with decreased motion. Dr. Renbaum opined that plaintiff's "shoulder complaints" were actually related to his cervical spine condition. He found that the left knee had tenderness to palpation. Dr. Renbaum concluded that plaintiff would be precluded from heavy work, heavy lifting, and prolonged weight bearing, kneeling, or squatting on his left knee. He opined that plaintiff had a 28% impairment from his cervical symptoms, no

impairment from his lumbar condition, and a 1% impairment from his left knee.  He also opined that plaintiff could not perform his "customary work activities," and that vocational rehabilitation was indicated.

On August 26, 2005, Dr. Wuest treated plaintiff's carpal tunnel symptoms with an injection to his right wrist.  Dr. Wuest noted his concern that plaintiff's problems with his upper extremities might be related to his cervical problems, and suggested further testing of the cervical spine if plaintiff's symptoms did not improve.

Dr. Parvin referred plaintiff to Dr. Paul Coelho, a physiatrist.  Following an examination on September 13, 2005, Dr. Coelho noted that plaintiff had a history of depression, appeared to be clinically depressed, had a flat affect, and was somewhat angry and frustrated.  He noted that plaintiff exhibited significant pain behavior, including splinting and grimacing with shoulder range of motion, and noted that plaintiff exhibited a "functional weakness that varies with audience and encouragement."  Given the chronic nature of plaintiff's pain, Dr. Coelho thought that plaintiff's goal of finding a "cure" for his pain was unrealistic.  He recommended anti-inflammatory medication, anti-depressant medication, and physical therapy.

On September 22, 2005, plaintiff told Dr. Wuest that the injection he had received the previous month had "helped a little bit" by reducing some of the discomfort and paresthesias he had been experiencing.  Plaintiff reported, however, that he continued to experience significant pain and numbness in both hands.  Dr. Wuest attributed this to cervical problems, and recommended that plaintiff complete a cervical work up before proceeding with carpal tunnel release surgery.

Plaintiff had a follow up visit with Dr. Coelho on October 24, 2005. Dr. Coelho noted that plaintiff had a flat affect, demonstrated significant pain behavior related to his cervical spine, and avoided all rotation. He also noted that plaintiff's motor strength in the upper extremities was full and symmetric. Dr. Coelho diagnosed chronic pain and depression, and recommended a multidisciplinary approach to plaintiff's pain. Plaintiff told Dr. Coelho that he had not been able to attend physical therapy since his last visit because he no longer had insurance coverage.

Plaintiff was examined by Dr. Paul Kaplan, a physical medicine and rehabilitation specialist and qualified medical examiner, on October 21, 2005. Dr. Kaplan met with plaintiff for 45 minutes and reviewed his medical records for 3 hours. He reported that physical examination and neurological testing yielded a number of abnormal objective findings. These included equivocal to upgoing Babinski signs bilaterally; definite muscular level at C4-5 bilaterally with muscular function below the level of the lesion, consistent with the presentation of a central spinal cord injury syndrome complex; reduced range of motion of the cervical spine in all planes to 25% of normal; Jamar dynamometer readings of 25-25-30 on the right and 20-20-26 on the left; tender painful bilateral paraspinal muscle spasms at the C6 vertebral body level bilaterally; reduced sensation and strength 4/5 in the distribution of the median nerves at the wrists; and positive Tinel's sign and Phelan's test at the wrists. Electrodiagnostic study showed that plaintiff had carpal tunnel syndrome bilaterally and a level of plaintiff's spine of C4-5 bilaterally incomplete with motor function below the level of the lesion, which was consistent with the presentation of a central cord syndrome.

Dr. Kaplan diagnosed cervical disc syndrome with associated strain/sprain disorder and cervical radiculopathy and cervical spinal stenosis; carpal tunnel syndromes; and spinal

cord injury with C4-5 levels bilaterally, incomplete with motor function below the level of the lesion, consistent with a central cord syndrome.  Dr. Kaplan concluded that plaintiff had a permanent disability which limited him to sedentary work.  He opined that plaintiff could perform sedentary work "predominately in the sitting position at a desk, bench or table with minimal demands for physical effort and with some degree of walking and standing permitted."  He stated that plaintiff could not lift more than 5 pounds and opined that plaintiff had "pain which can be tolerated with difficulty and which also causes marked handicap in the performance of activities."

On November 9, 2005, plaintiff told Dr. Lyons that the pain in his left knee had worsened over the previous few months, and that he was "having frequent locking up episodes" and significant pain when pivoting or twisting.  Plaintiff reported that he had stopped taking anti-inflammatory medications because they had not brought significant improvement.  He reported that he was no longer experiencing discomfort in his right knee, but that he continued to have problems with his wrist and neck.  Dr. Lyons noted that the left knee joint was enlarged, and that plaintiff had crepitus and a clicking sensation upon testing.  X-rays showed no joint space narrowing.  Dr. Lyons opined that plaintiff likely had "extension or degenerative changes to the meniscus," which were related to his initial work injury.  He also noted that plaintiff was "somewhat labile" emotionally, and that his mood appeared to be "down."

Dr. Michael Goldfield, a psychiatrist, performed a psychiatric evaluation of plaintiff on February 7, 2006.  Plaintiff told Dr. Goldfield that he had neck and back pain, which he rated as 6 or 7 on a scale of 10.  He also said that he felt anxious, tense, nervous, and irritable, experienced claustrophobia since his neck surgery, and suffered panic attacks

lasting 30 minutes every other day, during which he became sweaty and tremulous, and had an increased heart rate, palpitations, and difficulty swallowing.  Plaintiff told Dr. Goldfield that he felt depressed, had "crying spells" at least once a month, had difficulty sleeping, and felt tired and took a nap for 30 minutes to an hour every day.  He reported difficulty concentrating and a loss of self confidence, and said that he had given up pleasurable activities such as hunting and ranching.

Plaintiff omitted 12 items on the MMPI-2 that Dr. Goldfield administered.  His profile was considered valid, nevertheless, though some scale scores may have been lower than expected because of the omissions.  Dr. Goldfield reported that plaintiff was experiencing low morale and a depressed mood, was plagued by anxiety and worry, felt hopeless at times, and  was "tense and nervous with somatic complaints."  He also opined that plaintiff might be experiencing delusions or hallucinations.

Dr. Goldfield diagnosed Pain Disorder with Claustrophobia and a Depressive Disorder, NOS.  He rated plaintiff's current GAF, and highest GAF during the previous year, at 53.  Dr. Goldfield found that plaintiff had been "temporarily totally disabled on an emotional basis," from July 28, 2004, to the time of the psychiatric evaluation.  He concluded that plaintiff had a "moderate emotional disability" in ability to maintain work pace appropriate to a given workload, and a reduced ability to perform at a consistent pace. He also indicated that plaintiff could not work in an enclosed space without windows. Dr. Goldfield opined that plaintiff needed psychotherapy and psychotropic medication to prevent worsening in his condition and "further disability."

Plaintiff began treating with Dr. Arthur Edelmann, a licensed psychologist, in February, 2006.  Dr. Edelmann reported that plaintiff was "having difficulty dealing with the

repercussions of his accident and subsequent life changes," and recommended that plaintiff participate in a multi-disciplinary pain treatment program.

In his record of plaintiff's visit on March 2, 2006, Dr. Clyde Keys, plaintiff's treating physician, stated that plaintiff was "under tremendous stress" which was contributing to his neck pain. Dr. Keys noted that plaintiff had sleep difficulty, problems with irritability and concentration, and chronic pain. He described plaintiff as a "very tough" stoic individual who thought he would "be able to just push through everything." Dr. Keys noted that plaintiff did not want to be treated for symptoms of depression, but agreed to be treated for neck pain. Zoloft was prescribed.

Dr. Donald Schroeder, an orthopedic surgeon, conducted an independent medical exam on May 24, 2006, "to determine the extent of disability that may be preventing him from returning to gainful employment." Dr. Schroeder noted that plaintiff had a stooped physical appearance, very slow, guarded gait, and a short stride length. Plaintiff squatted to approximately 30% of normal, and exhibited a "moderate amount of pain behavior" which severely compromised the validity of the exam. Plaintiff's flexibility was compromised by his reluctance to move.

Dr. Schroeder diagnosed multilevel degenerative disc disease of the cervical, thoracic, and lumbar spine and an anxiety/panic disorder of undetermined etiology. He opined that plaintiff could not perform the physical demands of his occupation, and that, because of his age, weight, anxiety issues, and limited skills in all other areas, plaintiff was not employable in any occupation. Though Dr. Schroeder noted that plaintiff had significant psychological issues, he concluded that "it is the underlying physical disease that will prevent him from future gainful employment."

FINDINGS AND RECOMMENDATION - 19

Dr. James Morris, a pain specialist at Cascade Health Solutions, examined plaintiff on June 23, 2006. Dr. Morris noted that plaintiff's examination was consistent with persisting muscular spasm, diminished range of motion, and "neuropsychiatric sequelae including depression."

Dr. Teri Strong, a licensed psychologist at Cascade Health Solutions, examined plaintiff on June 23, 2006. Plaintiff produced scores in the normal range on the MMPI-2 and Zung Depression Scale tests. Dr. Strong recommended that plaintiff participate in a multidisciplinary pain program for chronic pain patients, receive phycho-pharmacological treatment for his anxiety and sleep disturbance, and continue psychological counseling with Dr. Edelmann for support in the adjustment and grieving process following the recent death of his wife. She noted that Zoloft had not been effective, and recommended a psychiatric evaluation to determine the best course of treatment.

Plaintiff attended seven weekly sessions at the Direction Pain Program between July 19, 2006, and August 30, 2006. Various drugs were prescribed, including Cymbalta, Lunesta, Gabitril, MS Contin, Methadone, Seroquel, and Provigil. Plaintiff also received biofeedback, psychological counseling, physical therapy, and medical treatment. In plaintiff's discharge summary, staff noted that, despite his good participation in physical therapy, plaintiff continued to have cervical and right upper extremity pain at a level of 7 to 9 on a scale of 10, severe muscle spasm and guarding, and extremely limited cervical and shoulder range of motion. Staff noted that bilateral hand numbness limited plaintiff's ability to manipulate fine objects, and opined that plaintiff's poor cervical range of motion limited his ability to use mirrors while driving and precluded "his return" to a professional driving position. Plaintiff's prognosis was rated as "guarded," and staff noted that plaintiff

experienced "significant chronic pain and physical limitations which prevent normal activities of daily living."  The discharge summary noted that plaintiff's grip strength bilaterally was "less than 10th percentile due to carpal tunnel syndrome."  Staff opined that, because of his "significant pain and physical limitations," plaintiff was not a candidate for vocational retraining.

In a visit to Dr. Keys on September 25, 2006, plaintiff reported that he was much worse off than he was before he attended the pain clinic.  Dr. Keys observed that plaintiff was tremulous and tearful, and concluded that the pain clinic had over prescribed medications, and that plaintiff had become addicted to methadone.  Dr. Keys diagnosed major depression, chronic pain, and sleep apnea, and tapered plaintiff off methadone.

On September 28, 2006, plaintiff went to an emergency room with complaints of severe shortness of breath, anxiety, tremulousness, tearfulness, and depression.  Dr. Peter Gowing noted that plaintiff appeared "quite literally panic-stricken," and reported that plaintiff said that he had been awake all night "because of a sensation of impending doom." Panic attack and chronic neck pain were diagnosed.  Plaintiff was given an injection of Ativan, with "excellent results," and was discharged with instructions to follow up with Dr. Keys.

Dr. Lilla re-evaluated plaintiff's upper extremities on October 17, 2006.  Dr. Lilla noted that plaintiff was "very protective of neck and shoulder motion" and had limited neck and shoulder motion.  Plaintiff was also "somewhat protective" of wrist motion and complained of pain in his wrists and bilateral tremors.  Dr. Lilla was "concerned that there is some elaboration of symptomatology . . . whether consciously or unconsciously, particularly

with respect to the tremors and diffuse subjective complaints." He opined that plaintiff's hand pain was more consistent with low-grade arthritis than with carpal tunnel syndrome.

On October 26, 2006, Dr. Keys noted that plaintiff had reported no more panic attacks. Dr. Keys opined that plaintiff had been over-medicated by the pain clinic.

In a visit to Dr. Keys on November 8, 2006, plaintiff reported severe abdominal pain and numbness and pain in his fingers. Dr. Keys noted that plaintiff was no longer taking Seroquel, Ativan, and methadone. He also noted that compression of plaintiff's median nerve on both hands produced pain radiating to the distribution of the median nerve. In a visit on November 14, 2006, plaintiff reported numbness and tingling in his feet. Dr. Keys noted that plaintiff's abdominal pain had largely resolved, and that plaintiff no longer appeared to be over-medicated.

Dr. Edelmann completed a form dated December 4, 2006, evaluating plaintiff's ability to perform work-related activities. Dr. Edelmann opined that plaintiff could not complete a normal workday and workweek without interruptions from psychologically based symptoms, and could not deal with normal work stress. He opined that plaintiff could not sustain an ordinary routine without special supervision, and could not perform at a consistent pace without an unreasonable number and length of rest periods. In addition, Dr. Edelmann opined that plaintiff could not deal with the stress of semiskilled and skilled work. Dr. Edelmann indicated that plaintiff's chronic pain precluded sustained work effort, concentration, and a regular schedule. He opined that grief issues and adjustment issues were undermining plaintiff's ability to "concentrate, relate consistently, and keep a regular schedule," and concluded that plaintiff's impairments would cause him to miss work more than four days per month.

In a letter dated April 2, 2007, Dr. Edelmann stated that, though plaintiff had taken a "proactive approach," he had "made little headway in decreasing his pain syndrome and its overall effect on his ability to function." He opined that plaintiff "would be unable to sustain a full work week without interruption and his pain limits his activities to such a narrow degree that he would have difficulty performing the physical tasks of most jobs." Dr. Edelmann added that plaintiff's increased pain levels would probably make his ability to control his mood "problematic in a work world situation."

Jeffrey Hallman, an occupational therapist, tested plaintiff on April 24, 2007. Hallman reported that plaintiff's effort was below average, and that he "appeared to be very focused upon his pain by the way he reported his pain in detail on his pre-test pain picture." He reported that plaintiff indicated "a high level of pain without a change in facial expression," and concluded that the test was invalid because of inconsistencies in plaintiff's performance.

Dr. Kaplan, who had earlier evaluated plaintiff in a report dated October 28, 2005, re-evaluated plaintiff on July 13, 2007. Dr. Kaplan again stated that an EMG revealed carpal tunnel syndromes bilaterally, and a spinal cord injury with central cord syndrome, with a motor and sensory level of C4-5 bilaterally incomplete with motor function below the level of the lesion and consistent with a central cord syndrome. He noted that central cord syndromes "often produce anxious and very frustrating issues for the patients unfortunate enough to have them, though they "almost always spare . . . the bowel and bladder function." Dr. Kaplan diagnosed cervical disc syndrome with associated strain/sprain disorder and cervical radiculopathy, cervical spinal stenosis; carpal tunnel syndromes bilaterally; and a

spinal cord injury with C4-5 levels bilaterally.  He concluded that plaintiff's condition had not changed appreciably since the October, 2005 evaluation.

Dr. Renbaum, who had evaluated plaintiff earlier in a report dated May 5, 2005, again evaluated plaintiff on September 20, 2007.  On examination, he noted diffuse tenderness over plaintiff's cervical musculature, with "essentially no motion of the neck in flexion, extension, lateral bending or rotation secondary to complaints of pain."  Dr. Renbaum noted decreased sensation over the median nerve distribution, limited shoulder range of motion secondary to complaints of pain, positive Tinel's sign bilaterally, tenderness to palpation from L3-S2, and decreased sensation over the great toes bilaterally.  He concluded that plaintiff's work disability, which then limited plaintiff to light work, had increased since the time of his earlier examination because of "the progression of underlying degenerative changes in the spine resulting in increased subjective complaints and objective findings on examination."

On March 4, 2008, after the ALJ had issued her decision finding that plaintiff was not disabled within the meaning of the Act, Dr. Edelmann wrote a letter to the Office of Disability Adjudication and Review challenging both the ALJ's assertion that Dr. Edelmann did not have the expertise to evaluate disability, and her conclusion that plaintiff was not wholly credible.  Dr. Edelmann stated that he had observed plaintiff for three years, and that plaintiff's behaviors and responses had been consistent.  He stated that plaintiff had impressed him as a "person of integrity" who had "utilized pain management techniques he has learned."  Dr. Edelmann added that plaintiff had "considerable pride and has difficulty admitting the extent of his disability."

<u>Testimony at Second Hearing</u>

1. <u>Plaintiff</u>

At the second hearing, plaintiff testified as follows.  Plaintiff's neck, back, arm, and hand pain had increased since the time of the first hearing.  Without medication, plaintiff's pain was constantly at a level of 8 or 9 on a scale of 10, and the pain worsened with strenuous activity, sitting at a keyboard, or keeping his neck in a fixed position.  Plaintiff is awakened by pain repeatedly throughout the night, and lies down several times a day for up to an hour and a half in order to relieve the pain.

Plaintiff drives occasionally to doctor appointments, the pharmacy, and the supermarket, but does not engage in other regular activities.  He does not go out to dinner or go on vacations.

During the past 15 years, plaintiff has worked only as a heavy equipment operator. Now he could not do that sort of work for more than 15 to 30 minutes.  Plaintiff earned about $5,000 per month when he worked, and would undergo further surgery if that would allow him to return to work.

2. <u>Vocational Expert</u>

In his hypothetical, the ALJ asked the VE to consider a person who should have no close interaction with the general public, should not work in an enclosed space without windows, and who was limited to lifting 10 pounds frequently and 20 pounds occasionally. The individual described could climb, stoop, kneel, and crouch occasionally, and could sit, stand, or walk continuously for up to 1 hour, for a total for 4 hours per day.  The individual

could balance frequently, and could perform frequent, but not constant, handling and fingering.

The VE testified that an individual with these limitations could not perform plaintiff's past work, but could work as a security guard, a production assembler, and assembly machine tender.  He testified that an individual who was off-task 20% of the time, outside of normal breaks, could not perform these jobs competitively, and that employees in entry level positions generally cannot miss work more than one day per month.  He further testified that an individual who was limited to occasional gripping, grasping, and handling could not perform the production assembler or assembly machine tender jobs, but could work as a security guard.

The VE testified that plaintiff had no skills from his previous work that would transfer to either light or sedentary work.


ALJ'S Decision

The ALJ found that plaintiff had not engaged in substantial gainful activity since the amended alleged date of the onset of his disability.  She found that plaintiff's severe impairments included depression, anxiety, history of knee injury, post-cervical spine fusion, sleep apnea, and carpal tunnel syndrome, and that these impairments, alone or in combination, did not meet or equal an impairment in the "listings," or cause more than mild limitations in plaintiff's activities of daily living, or more than moderate limitations in plaintiff's social functioning.  These conclusions were based in part on the ALJ's finding that plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were "not entirely credible."  The ALJ found that, though plaintiff could not

perform his past relevant work, he could work as a security guard, production assembler, or assembly machine tender. Accordingly, she found that he was not disabled within the meaning of the Act.

Standard of Review

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The initial burden of proof rests upon the claimant to establish his or her disability. Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996). The Commissioner bears the burden of developing the record. DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039. The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

<u>Discussion</u>

Plaintiff contends that the ALJ erred by failing to properly support her conclusion that he was not wholly credible; failing to give clear and convincing reasons for rejecting the opinion of Dr. Edelmann, his treating psychologist; failing to address the opinion of Dr. Kaplan, an examining physician, which limited him to sedentary work; failing to address the opinion of Dr. Kirkendall, an examining psychologist; failing to address the opinion of Dr. Schroeder, an examining orthopedic surgeon; and failing to meet the burden of establishing that he could perform work that existed in the national economy. Plaintiff asserts that these errors require that the action be remanded for an award of benefits.

Except as to Dr. Edelmann, the Commissioner agrees that the ALJ erred, and agrees that the underlying decision should be reversed and remanded to the agency. The Commissioner asserts, however, that the court should exercise its discretion to remand for further proceedings rather than for an award of benefits. On remand, the Commissioner states that the ALJ would be instructed to "further consider the examining source opinions" of Drs. Kaplan, Kirkendall, and Schroeder and explain the weight given to those opinions, to "further evaluate Plaintiff's subjective complaints and provide rationale in accordance with the disability regulations pertaining to evaluation of symptoms; further consider Plaintiff's maximum RFC; and if warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base."

Based upon a careful review of the record before the ALJ and of the ALJ's decision denying plaintiff's application for benefits, I agree that the ALJ made significant errors, and that the underlying decision must be reversed. For the reasons set out below, I further

conclude that further proceedings are not warranted, and that the action should be remanded for an award of benefits.

1. <u>ALJ's finding that plaintiff was not wholly credible</u>

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039 (9th Cir. 1995). If a claimant produces medical evidence of an underlying impairment, the ALJ "may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence." <u>Reddick v. Chater</u>, 157 F.3d 715, 722 (9th Cir. 1998) (<u>citing</u> <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 343 (9th Cir. 1990)(<i>en banc)</i>). Unless there is affirmative evidence that the claimant is malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. <u>Id.</u>, (<u>quoting</u> <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir. 1995)).

An ALJ rejecting a claimant's testimony may not simply provide "general findings," but instead must identify the testimony that is not credible and the evidence that undermines the claimant's complaints. <u>Dodrill v. Shalala</u>, 12 F.3d 915, 918 (9th Cir. 1993). In addition, SSR 96-7 requires an ALJ to consider the entire record and to consider several factors, including the claimant's daily activities, medications taken and their effectiveness, treatment other than medication, measures other than treatment used to relieve pain or other symptoms, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms."

The ALJ offered virtually no support for her conclusion that plaintiff's "statements concerning the intensity, persistence and limiting effects" of his symptoms were "not entirely

credible."  Assuming that the ALJ's assertion that "no physical examination findings or objective studies of record support disability" was intended as support for the credibility finding, it fails for at least four reasons.  First, as noted above, an ALJ must identify the testimony that is not credible, and cite the evidence that undermines the claimant's credibility.  While plaintiff made many statements concerning his symptoms, the ALJ made no attempt to identify any particular testimony that she found not credible, or cite any specific evidence supporting her credibility determination.  Second, where, as here, a plaintiff has produced evidence of underlying impairments, the ALJ may not discredit the claimant's testimony concerning the severity of the symptoms simply because objective medical evidence does not support the claimant's statements concerning the severity of symptoms.  Plaintiff produced substantial evidence of significant underlying impairments.  In the face of this evidence, it was not enough to simply assert that no physical examination findings or objective studies in the record supported disability.  Third, even if citation to an absence of "physical examination findings or objective studies" supporting disability could suffice, this assertion does not accurately characterize the medical record.  As noted in the lengthy summary of plaintiff's medical record set out above, substantial "physical examination findings" and "objective studies" support the conclusion that plaintiff is significantly impaired.  Some of the examples of this evidence include Dr. Kaplan's electrodiagnostic testing, which showed that plaintiff had motor function impairment consistent with a central cord syndrome, and his examinations showing reduced range of motion, muscle spasms, reduced sensation and strength in the median nerves and positive Tinel's and Phalen's signs at the wrists; Dr. Kirkendall's objective finding that plaintiff's depression would cause significant problems understanding and remembering instructions

and maintaining concentration, his finding that depression prevented plaintiff from engaging in appropriate social interactions, and his conclusion that chronic pain and depression would prevent plaintiff from working; Dr. Parvin's conclusions that x-rays showed significant spinal problems that required immediate attention; and Dr. Shroeder's conclusion, based upon a lengthy examination, that underlying physical disease would prevent plaintiff from working. Fourth, nothing in her decision indicates that, in conducting her credibility assessment, the ALJ satisfied the requirement that she consider the factors set out in SSR 96-7.

The ALJ's scant support for her credibility determination fell far short of the clear and convincing reasons needed to reject plaintiff's testimony concerning his limitations.

When an ALJ rejects a claimant's testimony regarding his limitations and the claimant would be deemed disabled if the testimony were credited, courts do not remand solely to allow the ALJ to make further findings regarding the testimony.  See Lester, 81 F.3d at 834 (citing Varney v. Secretary of Health and Human Services, 859 F.2d 1396, 1401 (9th Cir. 1988)).  Instead, testimony is credited as a matter of law.  Id.

Whether an action is remanded for an award of benefits or for further proceedings depends on the likely utility of additional proceedings.  Harman v. Apfel, 211 F.3d 1172, 1179 (9th Cir. 2000).  A reviewing court should credit evidence and remand for a finding of disability and an award of benefits if: 1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; 2) there are no outstanding issues to be resolved before a determination of disability can be made; and 3) it is clear from the record that the ALJ would be required to find the claimant disabled if the evidence in question were credited.  Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1996).

Under the guidance of these decisions, I recommend denying the Commissioner's motion to remand for further proceedings, and recommend remanding for an award of benefits.   There are no outstanding issues to be resolved before a determination of disability can be made, and it is clear that an ALJ who found plaintiff's testimony credible, and properly credited the opinions of other medical experts discussed below, would be required to find that plaintiff is disabled.

2. <u>ALJ's rejection of opinion of Dr. Edelmann</u>

As noted above, Dr. Edelmann, plaintiff's treating psychologist, opined that plaintiff could not complete a normal workday and workweek without interruptions from psychologically-based symptoms, deal with normal work stress, sustain an ordinary routine without special supervision, or perform at a consistent pace without an unreasonable number and length of rest periods.  He opined that plaintiff could not deal with the stress of semiskilled and skilled work, and stated that chronic pain precluded plaintiff's ability to sustain work effort, concentration, and a regular schedule.  Dr. Edelmann opined that plaintiff's impairments would cause him to miss work more than four days per month.

The ALJ rejected these opinions on the grounds that Dr. Edelmann was not a vocational specialist or a medical doctor, and because his opinions rested "on areas outside the realm of his expertise."  The ALJ stressed that the question of disability was "reserved to the Commissioner," and asserted that Dr. Edelmann's opinions were inconsistent with other contemporaneous observations by physicians.  The ALJ also asserted that Dr. Edelmann did no objective testing to determine the level of plaintiff's mental impairment, but instead

simply accepted plaintiff's "unreliable reports of pain."  She concluded that Dr. Edelmann

was "only speculating that a person in severe pain would have problems working."

Because treating physicians have a greater opportunity to know and observe their

patients, their opinions are given greater weight than the opinions of other physicians.

Rodriguez v. Bowen, 876 F.2d 759, 761-62 (9th Cir. 1989).  Accordingly, an ALJ must

support the rejection of a treating physician's opinion with "findings setting forth specific and

legitimate reasons for doing so that are based on substantial evidence in the record."

Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).  Rejection of a treating physician's

uncontroverted opinion must be supported by clear and convincing reasons.  Lester v. Chater,

81 F.3d 821, 830-31 (9th Cir. 1995).

The ALJ did not provide sufficient reasons for rejecting the opinions of

Dr. Edelmann, which were not inconsistent with any other expert opinions concerning

plaintiff's mental impairments and the likely effect of those impairments on plaintiff's ability

to perform work.  Dr. Edelmann's opinions appeared to be consistent with the opinions of

Dr. Goldfield, an examining psychiatrist, who opined in February, 2006, that plaintiff had

been "totally disabled on an emotional basis" since mid-2004, and of Dr. Kirkendall, an

examining psychologist who opined in June, 2005, that plaintiff's chronic pain and

depression were disabling. There is nothing in the record supporting the ALJ's assertion that,

because he was not a medical doctor or vocational expert, Dr. Edelmann lacked the expertise

to evaluate the effect of plaintiff's mental condition on his ability to perform work related

activities.  After the ALJ issued her decision, Dr. Edelmann submitted a letter stating that he

had extensive experience in evaluating applicants for disability, having worked as a

contractor conducting psychological evaluations for the Social Security Administration for

several years.  The ALJ's assertions that Dr. Edelmann simply relied on plaintiff's "unreliable reports of pain" and speculated that a person in severe pain would have difficulty working are not clear and convincing reasons for rejecting Dr. Edelmann's opinion.  As noted above, the ALJ did not provide adequate reasons for discounting plaintiff's testimony concerning the severity of his symptoms, and there is no basis for concluding that Dr. Edelmann simply speculated that a person experiencing severe pain could not work.

When an ALJ has provided inadequate reasons for rejecting the opinion of a treating physician, that opinion is credited as a matter of law.  Id. at 834 (citing Hammock v. Bowen, 879 F.2d 498, 502 (9th Cir. 1989)).  A reviewing court then has discretion to remand for further administrative proceedings or for a finding of disability and an award of benefits.  See, e.g., Stone v. Heckler, 761 F.2d 530, 533 (9th Cir. 1985).  As with the crediting of improperly rejected testimony of a claimant, the proper exercise of this discretion turns on the likely utility of additional proceedings.  Harman, 211 F.3d at 1179.  Here, as with the determination of whether to remand for further proceedings to revisit the question of plaintiff's credibility, there are no issues that need to be resolved before a determination of disability can be made, and an ALJ who accepted the rejected opinion would be required to find that plaintiff is disabled.  Accordingly, this action should be remanded for a finding of disability and an award of benefits.

3. Failure to address the opinions of Drs. Kaplan, Kirkendall, and Schroeder

Though my conclusion that this action should be remanded for an award of benefits on other grounds makes it unnecessary to do so, in order to create a full record for any

further review, I will briefly address plaintiff's contention that the ALJ erred in failing to address the opinions of Drs. Kaplan, Kirkendall, and Schroeder.

A. <u>Dr. Kaplan</u>

As noted above, Dr. Kaplan, an examining physical medicine and rehabilitation specialist, opined that plaintiff was restricted to sedentary work, performed mostly in a sitting position, with minimal physical demands, and lifting limited to 5 pounds. This opinion, if accepted, would require a finding of disability under Medical-Vocational Rule 201.14, based upon plaintiff's age, education, and lack of transferable skills. <u>See</u> 20 C.F.R., Pt. 404, Subpt. P, Appendix 2, Rule 201.14 (individual who is closely approaching advanced age, has high school education, no transferable skills, and is limited to sedentary work is "disabled" within the meaning of the Act).

An ALJ must provide clear and convincing reasons for rejecting the uncontradicted opinion of an examining physician, <u>Pitzer v. Sullivan</u>, 908 F.2d 502, 506 (9th Cir. 1990), and must provide specific and legitimate reasons that are supported by substantial evidence in the record for rejecting an examining physician's opinion that is contradicted by another physician. <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1043 (9th Cir. 1995). Plaintiff correctly notes that the ALJ gave no reasons for failing to credit Dr. Kaplan's opinion. That opinion, which is consistent with substantial evidence in the record, should be credited.

B. <u>Dr. Kirkendall</u>

Dr. Kirkendall, an examining psychologist, opined that plaintiff could not work because of chronic pain and depression. The ALJ acknowledged that opinion, but gave no

FINDINGS AND RECOMMENDATION - 35

explanation for rejecting it, and made no mention of Dr. Kirkendall's conclusion as to plaintiff's limitations in understanding, memory, concentration, and social interaction.

In failing to provide any reasons for rejecting Dr. Kirkendall's conclusion that plaintiff could not work, and failing to address his specific conclusions regarding aspects of plaintiff's mental functioning, the ALJ erred.


C. Dr. Schroeder

Dr. Schroeder, an examining orthopedic surgeon, opined that plaintiff was not employable in any occupation. He concluded that, though plaintiff had significant psychological issues, it was his "underlying physical disease that will prevent him from future gainful employment."

The ALJ did not acknowledge Dr. Schroeder's conclusion, or give any reason for rejecting his opinions.


D. Conclusion as to these doctors

Plaintiff's contention that the ALJ failed to properly address the opinions of these doctors, and to support her apparent rejections of these doctors' conclusions as to the severity of plaintiff's impairments, is well taken. These opinions were uncontradicted by any substantial evidence in the record, and were consistent with other evidence supporting the conclusion that plaintiff is disabled. The ALJ's failure to properly address these opinions provides additional support for the conclusion that this action should be remanded for an award of benefits.

4. <u>ALJ's burden to show that plaintiff could perform work that existed in the national economy</u>

Plaintiff contends that the ALJ failed to meet her burden of showing that plaintiff could perform other work that exists in the national economy because the improperly rejected opinions, if accepted, establish that plaintiff cannot perform work that exists in the national economy.  I agree.  If the improperly rejected opinions of Drs. Edelmann, Kaplan, Kirkendall, and Schroeder are accepted, plaintiff's disability is established.


<u>Conclusion</u>

Defendant's motion to remand for further proceedings should be DENIED, and a judgment should be entered reversing the decision of the Commissioner and remanding the action to the agency for a finding of disability and an award of benefits.


<u>Scheduling Order</u>

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due August 19, 2009.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 3rd day of August, 2009.


/s/  John Jelderks
John Jelderks
U.S. Magistrate Judge